[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 26, 2007
THOMAS K. KAHN
CLERK

_____

No. 06-10728

_____

D. C. Docket No. 03-00636-CR-3-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ERNEST ROMOND GIBBS, JR.,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(June 26, 2007)**

Before HULL and MARCUS, Circuit Judges, and BARZILAY,[*] Judge.

PER CURIAM:

---

[*]Honorable Judith M. Barzilay, Judge, United States Court of International Trade, sitting by designation.

Following a jury trial, Defendant Ernest Gibbs appeals his convictions for conspiracy to commit robbery (Count One), interference with interstate commerce by violence (Count Two), and causing the death of another by using a firearm during the commission of a crime of violence, such killing being a murder as defined in 18 U.S.C. § 1111 (Count Three), in violation of 18 U.S.C. §§ 1951(a) and 924(c)(1)(A), (c)(1)(A)(iii), and (j)(i), respectively. Gibbs also appeals his life sentence on Count Three. After review and oral argument, we affirm.

## I. BACKGROUND

### A. Trial Evidence

The trial evidence showed that Defendant Gibbs, in concert with Ricky Carter, Travis Carter, and Michael Leggett, attempted to rob an armored Bantek truck during one of its stops in Atlanta, Georgia on October 3, 2003.[1] Thompson Ebgon was driving the Bantek truck and was accompanied by two other Bantek guards, Moustafa Koura and Izzay Roy Denney. As guards Koura and Denney approached the front door of a bank to empty the automatic teller machines, Defendant Gibbs and Leggett approached the Bantek guards and opened fire.

---

[1]The original indictment in this case was against all four robbers and contained four counts. Ricky and Travis Carter and Michael Leggett pled guilty and were prosecution witnesses during Defendant Gibbs's trial. After their guilty pleas, a superseding indictment was issued against Defendant Gibbs which had only three counts. The reference to the particular counts in this opinion are to the superseding indictment.

Koura died almost instantly from a gunshot, and Denney was injured.

Denney ran to a Publix grocery store in the same shopping center to seek medical assistance for Koura and alerted the authorities. Defendant Gibbs grabbed the bank bag, but the bag was empty and no money was stolen. During the exchange Leggett was shot two times but, with Defendant Gibbs's assistance, fled the scene.

The three robbers hiked through a wooded area surrounding the shopping center and emerged onto Cascade Road, where Ricky Carter was waiting in a white pickup truck. In an effort to evade the police, the robbers traveled south to Dublin, Georgia before seeking medical treatment for Leggett. While en route to Dublin, Defendant Gibbs told the other men that he had "laid [his] man down." When they came within range of a local hospital, Travis Carter dialed 911 and explained to the operator that his friend Leggett was shot while trying to assist a broken-down motorist.

Ricky Carter called Stacy Grantham, Leggett's then-girlfriend, and told her to come to the hospital. Stacy Grantham and Kelly Sahni, her best friend, followed Ricky Carter's instructions and drove to the hospital. When Leggett was released, Grantham, Sahni, and Leggett followed Ricky Carter and Defendant Gibbs, who were in the white pickup truck, to an apartment complex in Baxley, Georgia. They

3

dropped off Ricky Carter and Gibbs at the complex and returned to Leggett's home in Jessup, Georgia.

A few days after the robbery, law enforcement officers received a tip from James Bennett, Leggett's cousin, implicating Leggett in the attempted robbery. Following this lead, officers discovered that Leggett received treatment at a hospital in Dublin for a gunshot wound. On October 12, 2003, Leggett was arrested for attempted armed robbery and felony murder. Leggett agreed to cooperate with police, confessed to the crimes, and implicated his co-conspirators: Ricky Carter, Travis Carter, and Defendant Gibbs.

## B. Gibbs's Confession

On October, 19, 2003, Defendant Gibbs was arrested at his mother's home. Officers transported Gibbs to the Appling County Sheriff's Office to process and interview him. Two FBI agents, Mark Alig and Robert McAllister, along with Investigator Jerry Baxley of the Appling County Sheriff's Office, conducted the initial interview of Gibbs in one of the investigator's offices. Before beginning the interview process, FBI Agent Alig removed Gibbs's handcuffs, read him "the charge from the face of the arrest warrant," provided him with a copy of the charge, and gave him a waiver-of-rights form. This form contained the standard

4

<u>Miranda</u> warnings,[2] including the right to remain silent, to have a lawyer present during questioning, and to stop the questioning at any time.

Gibbs signed the waiver-of-rights form, which we quote in full:

ADVICE OF RIGHTS

Place  <u>Baxley, GA</u>
Date <u>10/17/2003</u>
Time <u>9:00 AM</u>

YOUR RIGHTS

Before we ask you any questions, you must understand your rights.

You have the right to remain silent.

Anything you say can be used against you in court.

You have the right to talk to a lawyer for advice before we ask you any questions.

You have the right to have a lawyer with you during questioning.

If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time.

WAIVER OF RIGHTS

I have read this statement of my rights and I understand what my rights are. At this time, I am willing to answer questions without a lawyer present.

\*   \*   \*   \*   \*

---

[2]<u>See</u> <u>Miranda v. Arizona</u>, 384 U.S. 436, 86 S. Ct. 1602 (1966).

5

After Defendant Gibbs signed the waiver-of-rights form, Alig, McAllister, and Baxley also signed the form as witnesses to Gibbs's waiver.

After Gibbs's waiver, Agent Alig asked Gibbs about the attempted robbery that occurred on October 3, 2003. Defendant Gibbs orally confessed to the attempted armed robbery and shooting, and Agent Alig described Gibbs's oral confession at trial. Gibbs said that during the ride to Atlanta, he learned of the plan to rob the Bantek truck, was provided a .38 caliber revolver, and was instructed about his role in the robbery. Defendant Gibbs then implicated his co-conspirators, Ricky Carter, Travis Carter, and Michael Leggett. Gibbs admitted to firing a number of rounds from his revolver and shooting at least one of the guards.

After the oral confession, Agent Alig explained to Defendant Gibbs that it was FBI policy to document interviews with a written statement or report to memorialize the oral confession. Gibbs agreed to provide a statement. Agent Alig typed a statement in a first-person narrative, asking Gibbs for additional details and clarifying the statement when necessary. Upon completion, Gibbs was asked to look over the statement and to determine whether the statement was true and accurate to the best of his knowledge. After reviewing the statement for several minutes, Gibbs noticed a grammatical error in the statement: the first sentence on the second page should have read "guards," rather than "guard." Agent Alig used a

6

pen to make the change and then initialed it. Gibbs signed and initialed both pages, as did the law enforcement agents present. The entire interview process took about one and a half hours.

**C.    Suppression Hearing**

Ultimately, Defendant Gibbs pled not guilty and moved to suppress his post-arrest confession, arguing that he failed to knowingly and intelligently waive his rights under Miranda.

At the suppression hearing, Gibbs's counsel elicited testimony from Wynona Kennedy and Dr. Lisa Hutchinson Page, Gibbs's former ninth and tenth grade special education teachers in the mid-1990s (i.e., approximately eight years before the robbery). Both teachers testified that Gibbs had a specific learning disability in the area of reading and written expression and that during their time teaching Gibbs, he never read higher than a second grade level. The teachers conceded that Gibbs's verbal communication was at a higher level than his reading and writing abilities and that repeated exposure helps students become familiar with concepts. The teachers opined that in the ninth and tenth grades, Gibbs would have been unable to read the waiver-of-rights form. When they taught Gibbs, he would attempt to hide his disability, a behavior commonly known as masking. Gibbs dropped out of high school in the eleventh grade.

7

Gibbs's counsel also called a clinical psychologist, Dr. Mark Crawford, Ph.D., who had administered multiple tests to determine Gibbs's reading and writing abilities. Specifically, Dr. Crawford performed several subtests from the Woodcock-Johnson Test of Achievement.[3] According to Dr. Crawford, the results of each subtest placed Gibbs's reading level range between a below-kindergarten level and a third grade level.[4] Dr. Crawford did not think Gibbs was "malingering" because the test results were consistent with Gibbs's previous education records and Gibbs appeared "to put forth [a] good effort."

Based on these test results, Dr. Crawford did not believe that Gibbs would have been able to read either the waiver-of-rights form or the subsequent written statement created by Agent Alig. Dr. Crawford opined that even if Gibbs could have phonetically "sounded out" the words to read it aloud, he would not have been able to comprehend what he had read. In Dr. Crawford's opinion, Gibbs would not have been able to spot the grammatical error and make the subsequent change of "guard" to "guards."

Agent Alig and Investigator Baxley testified about Gibbs's interview and

_____

[3]Dr. Crawford's report was not admitted as evidence at the hearing on the motion to suppress. However, Dr. Crawford did testify orally as to the tests administered and the results.

[4]For instance, Dr. Crawford testified that Gibbs's reading decoding subtest placed him at a second grade, third month level; his phonetic decoding subtest placed him below the kindergarten level; and his broad reading subtest, which measures overall reading skills, placed him at a first grade, nine month level.

waiver of his rights. Before interviewing Gibbs, Agent Alig asked whether Gibbs could read and write the English language, whether he was under the influence of any drug or alcohol, and whether he had any other impairment. According to Agent Alig, Gibbs himself read the waiver-of-rights form aloud, and Agent Alig asked Gibbs if he understood his rights and if he had any questions. Gibbs stated that he understood the form and had no questions, and signed the form indicating that he waived his rights. However, Investigator Baxley testified that Agent Alig also read the waiver-of-rights form aloud to Gibbs and then gave the form to Gibbs to read.[5] According to Baxley, Gibbs "appeared to read the form" and had it in his hands "long enough to read it."

In an effort to show Gibbs's familiarity with the <u>Miranda</u> rights, the government also called multiple law enforcement officers who had previously dealt with or arrested Gibbs. Officer Anthony Tillman, who knew Gibbs since Gibbs was a young child, testified that during the period of 1996 to 2000, Gibbs was arrested a total of six times by the Appling County Sheriff's deputies. Officer Tillman dealt with Gibbs on multiple occasions in his capacity as a law

---

[5]Defense counsel moved to strike the testimony of Investigator Baxley because he testified at the second suppression hearing and was allowed to read the transcript of the testimony Agent Alig provided from the first hearing, despite the rule of sequestration being invoked. To resolve this dispute the magistrate judge did not rely on Baxley's testimony regarding Gibbs's interview. Instead, the magistrate judge relied on Agent Alig's testimony from the first hearing.

enforcement officer and on one occasion in 2001 arrested Gibbs for driving under the influence, his seventh arrest. Officer Tillman testified that during the 2001 arrest Gibbs had no trouble understanding the implied consent rights and that Gibbs later offered to make a deal with the police to "work off" his DUI charge.

Likewise, in 1999, when Officer Myles Moseley of the Baxley police arrested Gibbs on rape and kidnaping charges and verbally advised him of his Miranda rights, Gibbs had no trouble communicating. During the 1999 arrest, Officer Moseley had Gibbs draft a handwritten 26-line statement, which contained no punctuation and numerous errors.

**D.      Magistrate Judge's Report and Recommendation**

Based on the testimony at the suppression hearing, the magistrate judge found that Gibbs knowingly and intelligently waived his right to remain silent. Because "[Gibbs] did not testify at the suppression hearing, and there is no direct evidence that the events did not occur as testified to by Agent Alig," the magistrate judge found that Gibbs read the waiver-of-rights form aloud and stated that he understood those rights. The magistrate judge also found that Gibbs's actions "indicated that [he] communicated without difficulty and clearly discussed the events resulting in his arrest."

The magistrate judge further determined that the testimony of Gibbs's high

10

school teachers about his reading ability and comprehension in the mid-1990s was minimally probative as to whether he could have read or understood his <u>Miranda</u> rights in October 2003. Likewise, Dr. Crawford's testimony concerning Gibbs's reading abilities was of questionable validity because Crawford did not ask Gibbs to read the waiver-of-rights form, did not discuss these rights with Gibbs, and did not attempt to gauge Gibbs's knowledge and understanding of these rights. The magistrate judge concluded that, based on Gibbs's familiarity with the criminal system and the <u>Miranda</u> warnings specifically, and his ability to function at school and in the community, Gibbs did not lack the mental capacity to understand and waive his rights.

Gibbs objected to the magistrate judge's Report and Recommendation ("R&R"). On June 30, 2005, the district court overruled Gibbs's objections and adopted the R&R denying his motion to suppress.

## E.    Mental Capacity Evidence

Before trial, the prosecution filed a motion in limine to exclude any evidence of Gibbs's mental capacity at trial. After hearing arguments from both sides, the district court tentatively decided that if Gibbs chose to testify, the testimony of his high school teachers would be admissible. The district court explained that because no one but Gibbs could testify as to whether, at the time of his 2003

11

interview, he could read the waiver-of-rights form or written statement, Gibbs had to testify to "lay that predicate before we get into what would otherwise be extraneous, collateral and irrelevant material." The district court explained that, without Gibbs's foundational testimony, the teachers' and psychologist's testimony would be of "extremely limited" relevance under Federal Rule of Evidence 403, "because the jury will then be wondering why in the world are we worried about whether Mr. Gibbs can read or not. They are going to start thinking . . . . [t]hat you don't get confessions from illiterate people when we know illiterate people can certainly give a voluntary confession."

The district court was more troubled by the testimony of Dr. Crawford. The district court considered Dr. Crawford's findings questionable because Gibbs could have intentionally failed the reading comprehension tests. Upon further argument, the district court reserved ruling on the admissibility of Dr. Crawford's testimony, pending a determination by Gibbs as to whether he would testify. Ultimately, Gibbs chose not to testify.

## F.    Sentencing

At the conclusion of the trial, the jury convicted Gibbs on all three counts. The Presentence Investigation Report ("PSI") assigned Gibbs a base offense level of 20, pursuant to U.S.S.G. § 2B3.1(a), for conspiracy to commit robbery (Count

12

One) and interference with interstate commerce by violence (Count Two).  The PSI recommended that Gibbs's base level be increased by: (1) 2 levels, pursuant to U.S.S.G. § 2B3.1(b)(l),  because "the property of a financial institution . . . was taken, or . . . the taking of such property was an object of the offense"; and (2) 6 levels, pursuant to U.S.S.G. § 2B3.1(b)(3)(C), based on the death of Koura during the robbery.

The PSI also assigned Gibbs a base offense level of 43, pursuant to U.S.S.G. § 2A1.1, for the murder of Koura (Count Three).  The PSI recommended that Gibbs's base offense level be increased by 3 levels, pursuant to U.S.S.G. § 3D1.4, because he was convicted of three counts.  The PSI calculated a criminal history category of II based on Gibbs's prior conviction for DUI on October 28, 2002, and because he committed the present offense while still on probation for the prior conviction.  See U.S.S.G. § 4A1.1(d).  With an offense level of 46 and a criminal history category of II, the advisory guidelines range was life imprisonment.[6]

At the sentencing hearing, the district court heard evidence from a psychologist, Dr. Jethro Toomer, Ph.D., who interviewed and tested Gibbs.  Dr.

_____

[6]An offense level of 43 (without the 3-level enhancement to level 46) and any criminal history category also yields an advisory guidelines range of life imprisonment.  See U.S.S.G. ch. 5, pt. A (sentencing table).

13

Toomer testified that Gibbs was mildly mentally retarded.[7]  Dr. Toomer based this diagnosis on Gibbs's IQ score of 72[8] and Gibbs's poor adaptive functioning, such as his poor performance in school, lack of abstract reasoning, and inability to make appropriate independent choices.  The district court also heard evidence that Gibbs was raised in an abusive home and provided support to a troubled student while playing sports in the eighth grade.  Gibbs's counsel was also given an opportunity to explain and address Gibbs's previous arrests and convictions.

Gibbs's counsel objected to the imposition of a life sentence on Count Three and argued that Gibbs's limited mental capacity rendered him less culpable and deserving of a downward departure from his advisory guidelines range.  Gibbs's counsel also objected to a life sentence based on the sentences of Gibbs's co-conspirators.  Both Ricky and Travis Carter received 25-year sentences, while Leggett received a 40-year sentence.

Following the testimony, the district court declined to reduce Gibbs's sentence.  The district court examined the 18 U.S.C. § 3553(a) sentencing factors

[7]Dr. Toomer explained three classifications within a diagnosis of mental retardation: "There's mild mental retardation, which used to be called educable or trainable mental retardation.  Then there's moderate, and then there's profound."  During pre-trial and at trial, there was no evidence introduced of Gibbs's IQ or mild mental retardation.  Dr. Toomer did not testify until the sentencing hearing.

[8]On the tests that Toomer administered, Gibbs had a full scale IQ of 72, but a verbal IQ of 73 and a performance IQ of 76.

14

and concluded that a life sentence was proper. In making this determination, the district court considered Gibbs's mental capacity and his previous acts of kindness. However, the district court specifically cited the seriousness of the murder and attempted robbery offenses, the need to promote respect for the law, to provide just punishment, and to protect the public from further serious violent crimes in its decision to impose a life sentence.

Gibbs timely appealed his convictions and his life sentence on Count Three.[9]

## II. DISCUSSION

### A. Motion to Suppress

Gibbs argues that the district court erred in denying his motion to suppress his confession because he was never able to read beyond a third grade level, could not have actually read the waiver-of-rights form aloud, could not have understood the waiver-of-rights form even if he mouthed the words aloud, and thus his waiver was not knowing and intelligent.[10] See United States v. Glover, 431 F.3d 744, 748 (11th Cir. 2005) ("The government had to prove by a preponderance of the evidence that the defendant waived his rights 'voluntarily, knowingly, and

---

[9]The district court sentenced Gibbs to 240 months on Counts One and Two to run consecutively. On appeal Gibbs has not challenged those sentences.

[10]"Because rulings on motions to suppress involve mixed questions of fact and law, we review the district court's factual findings for clear error, and its application of the law to the facts de novo." United States v. Bervaldi, 226 F.3d 1256, 1262 (11th Cir. 2000). We construe all facts in the light most favorable to the United States. See id.

intelligently.'") (citations omitted).

The problem for Gibbs is that the government presented evidence that Gibbs actually read the waiver-of-rights form aloud, stated that he understood his rights and had no questions, and signed the waiver. Gibbs himself did not testify at the suppression hearing. The government's evidence also showed that Gibbs had experience with the criminal justice system, had been read his rights before, and had the mental capacity to make a knowing and voluntary waiver. Even Dr. Crawford testified that Gibbs could read to some extent, and Dr. Crawford never had Gibbs try to read the waiver-of-rights form. It is undisputed that there is no evidence of police intimidation or coercion during Gibbs's interview. Indeed, Gibbs does not claim his confession was not voluntary, but only that his waiver was not knowingly and intelligently made.

Accordingly, given the totality of the circumstances, we cannot say that the magistrate judge clearly erred in finding that Gibbs read the waiver-of-rights form, understood the waiver, and knowingly and intelligently waived his rights or that the district court clearly erred in adopting the magistrate judge's R&R. Therefore, Gibbs has failed to show that the district court erred in denying his motion to suppress his confession. See Moore v. Dugger, 856 F.2d 129, 134-35 (11th Cir. 1988).

**B.     Exclusion of Testimony**

Even if his confession was properly admitted into evidence, Gibbs next argues that it was still for the jury to determine the reliability and credibility of his confession.  He contends that the district court erred in excluding Dr. Crawford's and the two teachers' testimony regarding his poor reading ability and their opinions that he could not read or understand the waiver form and his written confession statement.  Gibbs asserts that the evidence was relevant because (1) his reading ability was the core issue regarding whether he gave the alleged confession, and (2) he could have used the evidence to impeach Agent Alig's testimony.  Gibbs asserts that the exclusion of this evidence violated his Sixth Amendment right to present a complete defense under Crane v. Kentucky, 476 U.S. 683, 106 S. Ct. 2142 (1986).[11]

---

[11]"We review a district court's evidentiary rulings for abuse of discretion."  United States v. Baker, 432 F.3d 1189, 1202 (11th Cir. 2005), cert. denied, __ U.S. __, 126 S. Ct. 1809 (2006). A district court abuses its discretion when its decision "rests upon a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact."  Id.  As a practical matter, however, "the abuse of discretion standard means that the district court has a range of choice. . . . We recognize a significant range of choice for the district court on evidentiary issues, which is to say we defer to its decisions to a considerable extent."  United States v. Brown, 415 F.3d 1257, 1265 (11th Cir. 2005), cert. denied, 547 U.S. 1023, 126 S. Ct. 1570 (2006).  Finally, even if the district court committed an error, we will not reverse if the error was harmless.  See Baker, 432 F.3d at 1202.

We need not decide whether, as the government contends, Gibbs failed to raise his constitutional Crane argument in the district court in order to determine whether plain error review applies.  Even applying de novo review, we will not reverse the district court due to this kind of constitutional error if it was harmless.  See Crane, 476 U.S. at 691, 106 S. Ct. at 2147. Thus, we consider Gibbs's Crane argument with the rest of our harmless-error analysis.

17

In this case, it is undisputed that the teachers' interaction with Gibbs was approximately eight years before his confession in issue and that none of the witnesses–the teachers or Dr. Crawford–gave Gibbs either the waiver form or confession to see if he could read them. Accordingly, the potential witnesses had no personal knowledge as to whether Gibbs read or actually understood the waiver form or his written confession. Further, Gibbs never testified that he could not read the waiver form or his written confession. Absent the potential witnesses giving the waiver form or confession to Gibbs, or Gibbs laying a foundation with his testimony, we cannot say that the district court abused its discretion in its evidentiary ruling. Specifically, the district court did not abuse its discretion in balancing the evidence's probative and prejudicial value and determining that, without Gibbs's testimony that he could not read the waiver form or his written confession, the potential relevance of this evidence would be outweighed by its danger to confuse the issues or mislead the jury. See Fed. R. Evid. 403.

Gibbs's reliance on Crane is misplaced. The Crane Court only addressed the voluntariness of the defendant's confession, which goes to the veracity of the confession in the first instance. See Crane, 476 U.S. at 687-88, 691, 106 S. Ct. at 2145, 2147 (describing how defendant sought to introduce evidence that his confession was coerced by "paint[ing] a picture of a young, uneducated boy who

18

was kept against his will in a small, windowless room for a protracted period of time until he confessed to every unsolved crime in the county, including the one for which he [was] convicted"). Gibbs produced no evidence of intimidation or coercion, and voluntariness is not at issue here.

Further, the district court did not go so far as to say any evidence about Gibbs's ability to read was completely irrelevant; rather, the district court indicated that such evidence, absent Gibbs's own testimony, was lacking foundation in this particular case. This is not the kind of blanket exclusion prohibited by Crane. See id. at 690, 106 S. Ct. at 2146.

Finally, even if the district court erred in its evidentiary ruling, such error was harmless. Agent Alig testified in detail about Gibbs's initial oral confession. There is no evidence that Gibbs did not give an oral confession, and thus the subsequent typed statement was cumulative. Gibbs's poor reading ability relates more directly to his written confession than his verbal confession. We recognize that Gibbs argues that if he impeached Alig's testimony about the written statement, the jury may have questioned the reliability of Alig's testimony about the oral confession. However, the relevance of Gibbs's reading ability to the accuracy or reliability of the oral confession is, at a minimum, significantly attenuated.

19

More importantly, Agent Alig's testimony about Gibbs's oral confession and the evidence of Gibbs's written confession were fully consistent with, and corroborated by, the detailed testimony of his co-conspirators, the witnesses at the hospital, and the victims of the robbery attempt. Three of Gibbs's co-conspirators testified that Gibbs joined them in the robbery, that Gibbs fired his gun, and that Gibbs grabbed the money bag and helped Leggett back to the getaway vehicle. All three men also testified that Gibbs boasted that he shot one of the guards. Grantham and Sahni testified that they saw Gibbs with the other conspirators at the hospital, along with the white pickup truck that a witness to the robbery had seen. The surviving victims' descriptions of the robbery attempt also corroborated the details in Gibbs's confession. Given the substantial evidence beyond Gibbs's confession about his role in the robbery attempt and shooting, any error in excluding evidence of Gibbs's reading abilities, without further foundation, was harmless.

## C.   Reasonableness of the Sentence

Post-Booker,[12] a sentencing court must first consult the Sentencing Guidelines and correctly calculate the advisory guidelines range for the defendant's offense. United States v. Talley, 431 F.3d 784, 786 (11th Cir. 2005); United States

---

[12]United States v. Booker, 543 U.S. 220, 125 S. Ct. 738 (2005).

v. Crawford, 407 F.3d 1174, 1178-79 (11th Cir. 2005). Gibbs admits that the district court correctly calculated his advisory guidelines range as life imprisonment for his murder offense in Count Three.

However, Gibbs contends that his life sentence is unreasonable because the district court: (1) totally ignored one of the 18 U.S.C. § 3553(a) factors, to wit, Gibbs's characteristics and specifically his mild mental retardation; and (2) improperly discounted Dr. Toomer's testimony about Gibbs's mild mental retardation when the court stated that Gibbs did not seem "to be retarded in the sense of the word that we commonly use" but "was clearly a slow learner." Alternatively, even assuming that the district court actually considered Gibbs's mild mental retardation, Gibbs argues that his life sentence still is unreasonable because (1) the district court erred in not accepting that Gibbs's mild mental retardation diminished his personal culpability for the murder and entitled him to a reduced sentence below life imprisonment; and (2) an unwarranted sentencing disparity exists between Gibbs and his codefendants. Before addressing Gibbs's arguments, we outline the standards that govern our post-Booker review of Gibbs's sentence and what happened at Gibbs's sentencing hearing.

1.     Standard of Review

Post-Booker, we review a defendant's total sentence for reasonableness in

21

light of the factors found in § 3553(a), which include:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need for deterrence; (4) the need to protect the public; (5) the need to provide the defendant with needed educational or vocational training or medical care; (6) the kinds of sentences available; (7) the Sentencing Guidelines range; (8) pertinent policy statements of the Sentencing Commission; (9) the need to avoid unwanted sentencing disparities; and (10) the need to provide restitution to victims.

Talley, 431 F.3d at 786 (citing 18 U.S.C. § 3553(a)); see also United States v. Williams, 435 F.3d 1350, 1353 (11th Cir. 2006).  This "reasonableness" review is deferential, and we "evaluate whether the sentence imposed by the district court fails to achieve the purposes of sentencing as stated in section 3553(a)."  Talley, 431 F.3d at 788.

While the district court must consider the factors listed in § 3553(a), the judge is not required to discuss each factor on the record.  Id. at 786; United States v. Scott, 426 F.3d 1324, 1329 (11th Cir. 2005) ("[N]othing in Booker or elsewhere requires the district court to state on the record that it has explicitly considered each of the § 3553(a) factors or to discuss each of the § 3553(a) factors."); see also Williams, 435 F.3d at 1353-54 (citing Scott and explaining that "a laundry list of § 3553(a) factors is not required").  Rather, "an acknowledgment by the district court that it has considered the defendant's arguments and the factors in section

22

3553(a) is sufficient under <u>Booker</u>." <u>Talley</u>, 431 F.3d at 786.

Further, "there is a range of reasonable sentences from which the district court may choose," and the burden of demonstrating unreasonableness rests with the party challenging the sentence. <u>Id.</u> at 788. "The weight to be accorded any given § 3553(a) factor is a matter committed to the sound discretion of the district court," and "[w]e will not substitute our judgment in weighing the relevant factors . . . ." <u>United States v. Williams</u>, 456 F.3d 1353, 1363 (11th Cir. 2006), <u>petition for cert. filed</u>, (U.S. Oct. 19, 2006) (No. 06-7352).

Although a sentence within the advisory guidelines range is not <u>per se</u> reasonable, we ordinarily will expect such a sentence to be reasonable. <u>Talley</u>, 431 F.3d at 788. Finally, in reviewing a sentence, "[w]e do not apply the reasonableness standard to each individual decision made during the sentencing process; rather, we review the final sentence for reasonableness." <u>United States v. Winingear</u>, 422 F.3d 1241, 1245 (11th Cir. 2005).

2.    Gibbs's Sentencing Hearing

We review the testimony presented at sentencing and then detail the district court's comments about the § 3553(a) factors.

The sentencing court first heard the testimony of Dr. Toomer, a psychologist, about why he diagnosed Gibbs as having mild mental retardation.

As noted earlier, Dr. Toomer indicated that there were three classifications of mental retardation: (1) mild mental retardation, which Dr. Toomer said "used to be called educable or trainable mental retardation"; (2) moderate mental retardation; and (3) profound mental retardation. On the tests that Dr. Toomer administered to Gibbs at age twenty-five, Gibbs had a full scale IQ of 72, with a verbal IQ of 73 and a performance IQ of 76. Dr. Toomer testified that the IQ scores for mild mental retardation are 70 to 75.[13]

Dr. Toomer further explained that for a person to be diagnosed as mildly mentally retarded, it was not enough to have an IQ score of 70-75 and instead the person must also have "adaptive functioning deficits" with an onset prior to age eighteen. As to adaptive functioning deficits, Dr. Toomer opined that Gibbs had "ongoing deficits in terms of academic functioning," as outlined in his school records, such that Gibbs was in special education and learning disabled classes and was not able to pass the graduation tests. In Dr. Toomer's testing, Gibbs read at a third grade level and performed arithmetic at a fifth grade level.

Dr. Toomer also opined that Gibbs had adaptive functioning deficits in the

[13]The Supreme Court has stated that "'[m]ild' mental retardation is typically used to describe people with an IQ level of 50-55 to approximately 70." Atkins v. Virginia, 536 U.S. 304, 308 n.3, 122 S. Ct. 2242, 2245 n.3 (2002). Dr. Toomer, however, explained that "there is considered to be a standard error of measurement of plus or minus five points in terms of the IQ score," which is apparently why Dr. Toomer used the upper end as 75 and concluded that Gibbs's IQ score of 72 fell within the range of mild mental retardation.

work area.  According to Dr. Toomer, "what we have found with Mr. Gibbs is that he worked–he held jobs, there were several jobs reflected in the record that he held, but if you look at the jobs, the jobs mainly consist of what we refer to as basic repetitive skills" and "don't require any abstract reasoning . . . ."

Dr. Toomer acknowledged that Gibbs had higher IQ scores prior to age twenty-five.  For example, Gibbs had IQ scores of 82 at age nine and 80 at age twelve but then 72 at age fifteen.  Dr. Toomer admitted that there were inconsistencies between his testing of Gibbs as having a 72 IQ versus the school officials' two earlier testings showing Gibbs's IQ as 82 and then 80.  However, Dr. Toomer did not have the raw data and subtests from the earlier tests to make comparisons between those tests and his.  Dr. Toomer testified that, in his opinion, the IQ scores of 82 and 80 were just "out there," while the 72 IQ score in his testing was more consistent with the corroborative data he had from interviewing Gibbs's family members and reviewing Gibbs's school records.

After Dr. Toomer's testimony, the district court heard testimony from Keith Johnson, Gibbs's eighth grade football coach.  Johnson stated that Gibbs was "a tremendous athlete and a good kid, and he just had a big heart."  Johnson explained how, in eighth grade, Gibbs helped Bryan Carter, another student.  Carter had depression, anxiety, and agoraphobia and was a waterboy for Gibbs's football

25

team. Gibbs befriended Carter. When Gibbs was told that he was going to receive the MVP award for the football season, Gibbs asked his coach to give the award to Carter instead. Johnson recounted how Gibbs's befriending and having Carter win the MVP award changed Carter's life dramatically.[14]

After hearing this testimony about Gibbs, the district court judge listed each of the statutory § 3553(a) factors and stated that she was guided by the statutory criteria in sentencing Gibbs, as follows:

> I am guided by the statutory criteria, which I have written down.
>     I must look at the nature and circumstances of the offense and the offender; I must consider a sentence that will reflect the seriousness of the offense so that it will promote respect for the law and provide just punishment for the offense; a sentence that will afford adequate deterrence to criminal conduct; protect the public from further crimes; and, a sentence that will provide the defendant with adequate educational, vocational training opportunities, and the like. So those are the standards.

(Emphasis added). The record is thus clear that the district court judge looked to both the nature of the offense and the characteristics of the offender in sentencing Gibbs. In considering those factors, the district court started with the nature of the offense, and found that Gibbs's felony murder offense involved the taking of human life and is the most serious kind of crime, as follows:

---

[14]Bryan Carter's mother, Julie Carter, confirmed this story. Ms. Carter testified that this friendship was a transformative moment for Bryan Carter, who then went to the prom, graduated from high school and technical college, and is a productive working citizen.

All right.  We'll start first applying those standards to Mr. Gibbs.

. . . We are talking about a felony murder.  We are talking about a situation that was premeditated where I don't believe–I don't know for sure, but I don't believe that the defendants went in with a notion that they were necessarily going to assassinate or execute people.  However, they went in with guns, and at the first obstacle, the obstacle being the guards having guns themselves, they started firing.  Now, I don't know if the firing was planned, that I don't know, but they started firing.

So it is clearly a felony murder situation.  It is the most serious kind of crime one can have to take the life of one human being, and it was just happenstance that Mr. Denney [the second victim shot in the attempted robbery] was alive and is over in Iraq fighting now, because he could have been killed just as well.  So it's extremely, extremely serious.  And in examining the nature and circumstances of the offense, there can be no offense that is more serious than murder.

I'll talk about offenders in just a minute.

. . . .

To reflect the seriousness of the offense, to promote respect for the law, obviously you want to send a message to society that if you are going to do something as bad as armed robbery, you don't take the second step, which is gunning down the guards, who are making nine or [ten dollars] an hour just trying to support their family, to effectuate that robbery.

The district court then considered the need for just punishment, deterrence, and protection of the public, which are all § 3553(a) factors, as follows:

To provide just punishment, it seems to me, again, absent exceptional circumstances in any robbery like this where the defendants intentionally shoot a gun and kill someone, just punishment calls for a life sentence.

To afford adequate deterrence to criminal conduct, it is the same, the same consideration.  One wants to communicate to the public that life is precious and that we as a society take it very seriously.  When someone robs another person of their life, we want

27

to deter that by saying the most severe penalty possible will be given when that happens. . . .

To protect the public from further crimes; again, we are talking about people willing to take the lives of others, and there's no reasonable assurance they wouldn't do the same thing if they were out on the street again.

The district court next considered the offenders' characteristics and whether there was something different about the offenders,[15] as follows:

Now that's what I think is the paradigm sentence in this case, life imprisonment. The question then is there something different about these offenders or what happened here that should make me deviate from what I think should be the sentence in 99 percent of the cases like this.

In regard to Gibbs's characteristics, the district court specifically considered Gibbs's mental capacity and his being a slow learner, as follows:

Turning first to Mr. Gibbs, there has been much talk and discussion of the fact that–I would call him a slow learner. I've seen a lot of these reports before. He does not seem to me to be retarded in the sense of the word that we commonly use, but he clearly does seem to be a slow learner.

The district court then considered other evidence about Gibbs's characteristics, including his kindness with Bryan Carter, as follows:

We also heard from folks from Baxley, Appling County, about the very kind thing [Gibbs] did back in middle school, and it does seem to me to be a very touching incident. And I suspect if someone had treated my child who was in such trouble that way, I would be in

---

[15]The district court sentenced Gibbs and his codefendant Leggett during the same sentencing hearing.

28

court to communicate that story as well. I know, notwithstanding what Mr. Gibbs has done since, you all remain grateful for that, and I appreciate and I am sure he appreciates you coming.

But as you can understand, there is more to a life than one act of kindness in middle school and, sadly, Mr. Gibbs has chosen to go a different way since that rather heartwarming story. And the other things we have heard about him have not been so good, and some of them have been pretty bad, of course the worst being this particular incident.

When I evaluate the mitigating factors, I have to get back to the fact of the seriousness of this offense and to my need to protect the public.

During the sentencing hearing, Gibbs's attorney argued that Gibbs's mental retardation resulted in impulsive behavior and an inability to think about consequences, and that his mild mental retardation made him less personally culpable than other defendants and entitled him to a sentence reduction. In response, the district court judge noted, however, that: (1) under the § 3553(a) statutory factors, she also was expressly required to consider a defendant's dangerousness and the protection of the public, and (2) these same traits also made Gibbs more dangerous, as follows:

[Gibbs's counsel]: . . . . [M]entally retarded persons frequently know the difference between right and wrong and are competent to stand trial. However, because of their impairments by definition, they have diminished capacities to understand and process information, to communicate, . . . to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others.

. . . [T]here is no evidence that they are more likely to engage in

29

criminal conduct than others, <u>but there is abundant evidence that they often act on impulse</u> rather than pursuing a premeditated plan, and that in a group setting <u>they are followers rather than leaders</u>.

> . . . .

> The Court: But don't you contradict yourself? If he's a fellow that's just sitting around waiting to have somebody tell him to go commit a violent act, he's always ready to erupt at any time if he's so suggestible.

> [Gibbs's counsel]: What I'm saying is that he, based on Dr. Toomer's diagnosis and testimony, <u>he does not have the ability to think about consequences.</u>

> The Court: Which makes him more dangerous.

> [Gibbs's counsel]: But the Supreme Court recognizes that because of their limited mental diminished capacity that that, in fact, makes them less culpable than someone who is engaged in the same act but that's not been diagnosed.

> The Court: I'm supposed to look at danger and protecting the public. That's one of my criteria.

(Emphasis added). In response to defense counsel's argument that Gibbs's behavior was aberrant and that he was just a "follower," the district court observed that Gibbs had other violent conduct in his criminal history.

In arguing for a life sentence and against a reduction due to Gibbs's mental capacity, the government stressed that: (1) with his prior arrests and convictions, Gibbs knew by this murder in October 2003 that violence leads to arrests; (2) Gibbs was employable, had a long history of employment, and was functioning in society; (3) Gibbs was able to get a gun, could shoot, and participated in a robbery; and (4) Gibbs was able to recount the details of his offenses to Agent Alig.

After considering the § 3553(a) factors, the district court ultimately

30

sentenced Gibbs to life imprisonment. With this background, we now turn to Gibbs's arguments on appeal.

### 3. Gibbs's Arguments

On appeal, Gibbs's first argument is that the district court totally ignored one of the § 3553(a) factors, to wit, Gibbs's mild mental retardation. We disagree because the record as a whole shows that the district court did consider all of the § 3553(a) factors, including Gibbs's characteristics. Moreover, the district court here went far beyond what is required by actually discussing each § 3553(a) factor on the record. See Talley, 431 F.3d at 786 ("[A]n acknowledgment by the district court that it has considered the defendant's arguments and the factors in section 3553(a) is sufficient under Booker."); Scott, 426 F.3d at 1329 ("[N]othing in Booker or elsewhere requires the district court to state on the record that it has explicitly considered each of the § 3553(a) factors or to discuss each of the § 3553(a) factors."). While Gibbs may well disagree with the weight the district court gave his mild mental retardation, Gibbs has not shown that the district court failed to consider his characteristics or traits.

We also reject Gibbs's second argument that the district court erred in its consideration of Dr. Toomer's testimony by finding that Gibbs seems "to be a slow learner" and is not "retarded in the sense of the word that we commonly use."

31

Although Dr. Toomer tested Gibbs's IQ as being 72, even Dr. Toomer admitted that Gibbs had prior IQ scores of 82 and 80. And Dr. Toomer himself acknowledged that mild mental retardation was previously called "educable" mental retardation. Moreover, the evidence at sentencing also showed that Gibbs performed to some degree in school, played football well, and had a long history of employment. The sentencing judge tried the case; heard about Gibbs's ability to participate in the robbery, shooting, and escape; and observed Gibbs's abilities and conduct during trial. The district court did not disregard Dr. Toomer's testimony, but instead considered it along with all the other evidence presented at trial and at sentencing. Given the district court's role as a factfinder and the overall evidence, we cannot say that Gibbs has shown any reversible error in the district court's consideration of Dr. Toomer's testimony or in its factfinding that Gibbs was basically a slow learner and not seriously retarded.

Gibbs's third argument is that the district court erred in not accepting that Gibbs's mild mental retardation entitled him to a reduced sentence because it diminished his personal culpability for the murder. We agree with the premise of Gibbs's argument: the district court indeed rejected his counsel's argument that his mild mental retardation was a mitigating factor that entitled him to a reduced sentence. Instead, with the knowledge that Gibbs had murdered Koura and had

32

prior violent conduct, the district court observed that Gibbs's impulsivity and inability to think about consequences–which Gibbs's counsel argued stemmed from his mild mental retardation–make him more dangerous to the public and warrant a sentence that would protect the public. Thus, the question becomes whether, in applying the § 3553(a) sentencing factors in a murder case, a district court errs when it considers the defendant's diminished-mental-capacity traits of impulsivity and inability to think of consequences as a factor that makes the murder defendant more dangerous and warrants a sentence that will protect the public.

We start our analysis with the Sentencing Guidelines, which expressly address the role of diminished mental capacity in sentencing, because § 3553(a) directs district courts to consult and consider the Sentencing Guidelines and the pertinent policy statements of the Sentencing Commission. 18 U.S.C. § 3553(a)(4), (5).

Specifically, § 5K2.13 of the Sentencing Guidelines provides that a downward departure <u>may</u> be warranted if "(1) the defendant committed the offense while suffering from a significantly reduced mental capacity; and (2) the significantly reduced mental capacity contributed substantially to the commission

33

of the offense."[16]  U.S.S.G. § 5K2.13.  However, § 5K2.13 further provides that the

district court <u>may not</u> depart below the applicable guidelines range if the offense

involved actual violence, as follows:

> the court may not depart below the applicable guidelines range if . . .
> [(1)] the facts and circumstances of the defendant's offense indicate a
> need to protect the public because the offense involved actual violence
> or a serious threat of violence; [or (2)] the defendant's criminal
> history indicates a need to incarcerate the defendant to protect the
> public . . . .

<u>Id.</u>

Both the Sentencing Guidelines and case law are clear that a § 5K2.13

downward departure may not be based on diminished mental capacity where the

defendant committed a violent crime.  <u>See</u> <u>United States v. Salemi</u>, 26 F.3d 1084,

1087 (11th Cir. 1994) ("While it is undisputed that Salemi had a history of mental

illness, the guidelines and the case law are clear in stating that mental and

emotional conditions should not be considered if the defendant committed a violent

crime."); <u>United States v. Russell</u>, 917 F.2d 512, 517 (11th Cir. 1990) ("[W]e think

that the guidelines show that the Commission considered the effect of emotional

---

[16]Section 5K2.13 further states: "[s]imilarly, if a departure is warranted under this policy
statement, the extent of the departure should reflect the extent to which the reduced mental
capacity contributed to the commission of the offense."  U.S.S.G. § 5K2.13.  The Application
Note to § 5K2.13 provides that for purposes of this policy statement, "[s]ignificantly reduced
mental capacity" means "the defendant, although convicted, has a significantly impaired ability
to (A) understand the wrongfulness of the behavior comprising the offense or to exercise the
power of reason; or (B) control behavior that the defendant knows is wrongful."  U.S.S.G.
§ 5K2.13 cmt. n.1.

conditions on culpability and decided that ordinarily mental and emotional conditions are irrelevant to mitigate defendants' culpability, but that in extraordinary instances the condition may be relevant–but then only if the defendant committed a nonviolent crime."). Thus, in calculating Gibbs's advisory guidelines range, the district court could not have granted a § 5K2.13 downward departure based on diminished mental capacity because Gibbs's offense clearly involved actual violence that indicated a need to protect the public. This perhaps explains why Gibbs did not make a § 5K2.13 motion for a downward departure based on his diminished mental capacity.

Given that nothing in the advisory Sentencing Guidelines helps him, Gibbs relies only on the Supreme Court's decision in Atkins v. Virginia, 536 U.S. 304, 122 S. Ct. 2242 (2002). For several reasons, Atkins does not help Gibbs either.

First, Atkins addressed only the constitutional issue of "whether the death penalty should ever be imposed on a mentally retarded criminal." Id. at 307, 122 S. Ct. at 2244. Gibbs has made no constitutional claim in this case. Further, Atkins does not address, much less contradict, the sentencing policies in the advisory Sentencing Guidelines, which do not permit downward departures due to diminished mental capacity when the defendant's offense involved actual violence.

Second, Atkins involved policy concerns about the death penalty and not

35

generalized sentencing.  The petitioner Atkins had a full scale IQ score of 59 and was sentenced to death for capital murder.  Id. at 307-09, 122 S. Ct. at 2244-45.  The Supreme Court noted that retribution is one justification given for the death penalty; that under a retribution theory, the culpability of the individual offender is relevant; and that the average murderer is not subject to the death penalty.  Id. at 318-19, 122 S. Ct. at 2251.  The Supreme Court stressed that the death penalty is reserved for a very narrow category of the most serious crimes and reasoned that if "the culpability of the average murderer is insufficient to justify the most extreme sanction available to the State, the lesser culpability of the mentally retarded offender surely does not merit that form of retribution."  Id. at 319, 122 S. Ct. at 2251.  The Supreme Court also noted its concern that "[m]entally retarded defendants in the aggregate face a special risk of wrongful execution."  Id. at 321, 122 S. Ct. at 2252.

The Supreme Court's concerns in Atkins regarding the heightened level of culpability required for the death penalty are not present here because this is not a capital case.  See Harris v. McAdory, 334 F.3d 665, 668 n.1 (7th Cir. 2003) ("A cursory glance at Atkins reveals that the Court was addressing the issue of mental retardation solely in the context of capital punishment.").[17]  The Supreme Court's

---

[17]The Supreme Court has continually recognized a distinction between capital and noncapital sentences.  See, e.g., Harmelin v. Michigan, 501 U.S. 957, 994-96, 111 S. Ct. 2680,

determination that mentally retarded criminals, like average murderers, lack the personal culpability to be eligible for the death penalty, which is reserved for the most heinous murder crimes, does not mean that such criminals' diminished culpability always should affect other kinds of sentencing calculations. All the Supreme Court concluded in Atkins was that mentally retarded murderers were not personally culpable enough to deserve the retribution of execution, especially given that most murderers do not receive the death penalty. Gibbs fails to cite any case that applies Atkins outside the death penalty context.

Although neither § 5K2.13 nor Atkins helps Gibbs, we do live in a post-Booker world where the guidelines range is now only advisory. Indeed, "Booker restored to district courts a measure of discretion that the mandatory Guidelines had removed." United States v. Hunt, 459 F.3d 1180, 1184 (11th Cir. 2006). "This discretion is bounded, of course, by Congress's mandate to consider the factors in section 3553(a), one of which, subsection four, is the Sentencing Guidelines." Id. Accordingly, after correctly calculating the advisory guidelines range, "'the district court may impose a more severe or more lenient sentence as long as the sentence is reasonable.'" Williams, 435 F.3d at 1353 (quoting Crawford, 407 F.3d at 1179). Thus, in this case, the district court had authority to

2701-02 (1991) (discussing the "qualitative difference between death and all other penalties").

37

impose a sentence below the advisory guidelines range of life imprisonment based on the § 3553(a) factors, including Gibbs's characteristics. However, the district court was not required to sentence below the advisory guidelines range but was required only to consider the § 3553(a) factors, which the district court clearly did.

Here, the district court simply weighed certain § 3553(a) factors (such as the seriousness of the crime and the need to protect the public) more heavily than others (such as Gibbs's diminished mental capacity) and chose to impose the advisory guidelines sentence of life imprisonment. Given that Gibbs caused the death of Koura in this case and had other violent acts in his criminal history, we cannot say that the district court erred in (1) noting that Gibbs's impulsiveness and inability to think of consequences also made him more dangerous, and (2) giving significant weight to the need to protect the public, one of the § 3553(a) factors. Because the weight to be given to each factor is committed to the sound discretion of the district court, "[w]e will not substitute our judgment in weighing the relevant factors . . . ." Williams, 456 F.3d at 1363.

As to his fourth argument, Gibbs has not shown any unwarranted sentencing disparity. Gibbs's codefendants all pled guilty and testified for the government but still received very substantial sentences (40 years' imprisonment for Leggett, who also had a gun, and 25 years' imprisonment each for Ricky and Travis Carter). We

38

note that while Leggett and Ricky and Travis Carter pled guilty to, and were sentenced on, several offenses, including the conspiracy to commit robbery, they did not plead guilty to the murder of Koura. Because the jury convicted Gibbs of the murder of Koura, this alone defeats Gibbs's sentence-disparity claim.

For all of these reasons, we cannot say that Gibbs has carried his burden to show that his life sentence for the murder in Count Three is unreasonable.

## III. CONCLUSION

For all of the foregoing reasons, we affirm Gibbs's convictions on all three counts and his sentence on Count Three.

**AFFIRMED.**